COMMONWEALTH of Pennsylvania, Appellee

v.

David Edward RICKER, Appellant

41 MAP 2016

Supreme Court of Pennsylvania.

ARGUED: December 6, 2016

DECIDED: September 28, 2017

William Costopoulos, Esq., Costopoulos, Foster & Fields, for Appellant.

Francis T. Chardo III, Esq., Dauphin County District Attorney's Office, Edward Michael Marsico Jr., Esq., for Appellee.

Timothy Jon Barker, Esq., Stephanie Elizabeth Lombardo, Esq., York County District Attorney's Office, Rachel Haynes Pinsker, Esq., Pennsylvania Coalition Against Domestic Violence, Peter Rosalsky, Esq., Defender Association of Philadelphia, Barbara A. Zemlock, Esq., Perry Shore Weisenberger & Zemlock, Leonard Sosnov, Esq., for Amicus Curiae parties.

## ORDER

PER CURIAM

AND NOW, this 28th day of September, 2017, this appeal is dismissed as having been improvidently granted.

Chief Justice Saylor files a concurring statement.

Justice Wecht files a dissenting statement.

Justice Donohue did not participate in the consideration or decision of this case.

## CONCURRING STATEMENT

### CHIEF JUSTICE SAYLOR

In this criminal case, appeal was allowed to consider whether the Commonwealth may satisfy its burden at a preliminary hearing through hearsay evidence alone, as well as whether a defendant has a state or federal constitutional right to confront witnesses against him in such proceedings. Presently, I conclude that the prosecution did not proceed, at Appellant's preliminary hearing, solely through hearsay. Furthermore, Appellant's contention that the Commonwealth's essential presentation rested exclusively upon hearsay is interwoven into his constitutional arguments. I also note that the Court is divided as to material considerations involved in assessing whether, or to what extent, an accused enjoys a constitutional right of confrontation at a preliminary hearing, and some of these considerations are not substantially addressed in the present briefing.

For these reasons, I have determined that this appeal does not present a suitable vehicle by which to resolve the questions presented and that it should be dismissed. Given the substantial significance of these issues, however, I have undertaken to explain my reasoning in greater detail below and to specify some of the considerations which I believe should be developed in the advocacy in future cases or addressed via the rulemaking process to secure a resolution.

In June 2014, Appellant shot Pennsylvania State Trooper Michael Trotta while the officer was on Appellant's property investigating possible crimes. Trooper Trotta survived the encounter. Appellant was arrested and charged with attempted murder, assault of a law enforcement officer, and aggravated assault.

At the preliminary hearing before a magisterial district judge (the "MDJ"), the Commonwealth presented live testimony from an investigating officer, Trooper Douglas A. Kelley, who attested that he observed Trooper Trotta's gunshot wounds and participated in a search of Appellant's residence, where officers found plastic bags and jars containing marijuana, as well as eighty firearms. Additionally, Trooper Kelley indicated that he saw an AK–47 assault rifle, a pistol, and spent cartridge casings, in or near the garage area of Appellant's residence. He further explained that Appellant had also been shot in the confrontation and that the trooper interviewed him in the hospital. According to the witness, Appellant said that he was near his garage holding an AK–47 rifle when he was shot and commented that he did not understand why Trooper Trotta did not leave his property and secure a warrant.

During Trooper Kelley's testimony, the prosecution played an audiotape recording of his interview with Trooper Trotta, in which the latter attested to the following. On June 1, 2014, Trooper Trotta received a radio call to respond to a disturbance on Green Hill Road in West Hanover Township. He arrived to find a mailbox had been impacted by a vehicle, and witnesses identified Appellant as the driver. Trooper Trotta proceeded to Appellant's property, where he first encountered Appellant's wife, then Appellant, who was belligerent, manifested signs of intoxication, hit his wife, and threatened the officer both verbally and by his conduct. While still sitting in his vehicle to protect himself from Appellant's dog, Trooper Trotta attempted to retrieve a Taser weapon, and he and Ap-

pellant fought over control of that implement.

The incident further escalated when Appellant produced a pistol and retreated to his garage. There, Trooper Trotta observed Appellant in possession of an assault rifle and believed that Appellant was positioning himself to engage another officer who had been summoned by Trooper Trotta to assist him. Accordingly, the trooper fired several shots at Appellant. Trooper Trotta then approached Appellant, who was prone in the garage, and was shot by Appellant.[1]

When the audiotape was played, Appellant's lawyer expressed a desire to examine Trooper Trotta, indicating that he found it to be unsatisfactory that the trooper's statement was introduced via hearsay with no opportunity afforded for cross-examination. Counsel acceded, however, to proceeding with the presentation of the Commonwealth's case, but he requested that another hearing be slated to permit him to question Trooper Trotta. The district attorney opposed the request on the following terms:

> We didn't just present hearsay because we also presented the statement of the Defendant in which he indicated that it was he and that he had a rifle in his hand.
>
> We also had the testimony regarding the recovery of the firearms, including the rifle and the cartridge cases from the garage, which are evidence of the discharge of that firearm from the garage.
>
> The preliminary hearing is not for the purpose of discovering the Commonwealth's case or to get a crack at the witnesses. It is to determine whether or

not this Defendant, who is at liberty on bail, should be held for trial.

N.T., July 10, 2014, at 43.

Appellant's lawyer further indicated that he had been led to believe that the Commonwealth would be presenting testimony from the trooper who had been called to assist Trooper Trotta, and counsel attempted to call that officer as a witness. The MDJ, however, did not permit this. In his concluding argument, Appellant's attorney argued that the use of force against Trooper Trotta was justified. Counsel stated:

> This guy was in his home. He was retreating. He had a firearm by his side and a very ominous looking firearm, an AK–47 but it was never pointed. It was never discharged.
>
> The question is, did he give up his right to live having that gun by his side. And I respectfully submit that he did not because Trotta intended to kill him.
>
> And if that first shot didn't take him out, he shot him again. Ricker never shot back after that first shot was fired.
>
> Ricker was in his house. Ricker never shot back after that second shot was fired and indeed a third shot was fired and he returned fire.
>
> I believe it was justified because Trotta's action was excessive and deadly and unlawful and it just didn't need to happen.

*Id.* at 45. Counsel then reiterated his position that the hearing should be continued so that the officers could be questioned.

The MDJ concluded that the Commonwealth had met its burden and denied the request for a continuance. In this regard, the MDJ explained that the purpose of a preliminary hearing is not to establish

---

**1.** A more detailed recitation of the interview with Trooper Trotta appears in the Superior Court's opinion in the initial appeal. *See Commonwealth v. Ricker,* 120 A.3d 349, 351–52 (Pa. Super. 2015).

guilt or innocence, but rather, to determine whether a *prima facie* case has been presented. *See generally Commonwealth v. McBride*, 528 Pa. 153, 160, 595 A.2d 589, 592 (1991) ("A judge at a preliminary hearing is not required, nor is he authorized to determine the guilt or innocence of an accused; his sole function is to determine whether probable cause exists to require an accused to stand trial on the charges contained in the complaint.").

Subsequently, Appellant filed a petition for writ of *habeas corpus* requesting dismissal of the charges based on the Commonwealth's asserted failure to meet its burden of proof at the preliminary hearing. In the petition, Appellant again acknowledged that he had shot Trooper Trotta, but he claimed that he had been retreating and was justified in defending himself.

Appellant recognized that the function of a preliminary hearing is to protect the right against unlawful arrest and detention and that, therefore, the Commonwealth's burden is limited to presenting "evidence with regard to each of the material elements of the charge and to establish sufficient probable cause to warrant the belief that the accused committed the offense." Petition for Writ of *Habeas Corpus* at 4 (quoting *McBride*, 528 Pa. at 158, 595 A.2d at 591). He also acknowledged that hearsay evidence is admissible at a preliminary hearing and that the prosecution may rely upon hearsay to meet its burden of establishing a *prima facie* case. *See id.* Appellant contended, however, that hearsay *alone* will not suffice. *See id.* at 4–5 (citing *Commonwealth v. Jackson*, 849 A.2d 1254, 1257 (Pa. Super. 2004), and *Commonwealth v. Tyler*, 402 Pa.Super. 429, 433–34, 587 A.2d 326, 328 (1991)). Appellant relied

substantially upon the plurality decision of this Court in *Commonwealth ex rel. Buchanan v. Verbonitz*, 525 Pa. 413, 581 A.2d 172 (1990), explaining that, in that case, Justices found that the presentation of solely hearsay at a preliminary hearing violated state constitutional norms of confrontation and due process. *See id.* at 418–19, 581 A.2d at 175 (lead opinion) (relying primarily on the right of confrontation); *see also id.* at 419–21, 581 A.2d at 175–76 (Flaherty, J., concurring) (invoking due process). Furthermore, Appellant contended that, at his preliminary hearing, the Commonwealth had based its presentation concerning the material elements of the charged offenses exclusively upon hearsay.

Appellant's petition also addressed recent amendments to Rule of Criminal Procedure 542(E), which prescribe:

> Hearsay as provided by law shall be considered by the issuing authority in determining whether a *prima facie* case has been established. Hearsay evidence shall be sufficient to establish any element of an offense, including, but not limited to, those requiring proof of the ownership of, non-permitted use of, damage to, or value of property.

Pa.R.Crim.P. 542(E). While, again, Appellant conceded that the prosecution may rely upon some hearsay evidence at a preliminary hearing, to the degree that the rule sanctions reliance on hearsay alone, Appellant argued that its provisions offend constitutional requirements and render a preliminary hearing "a meaningless proceeding if the prosecution could simply call the affiant to the stand and read from his criminal complaint/affidavit of probable cause in order to get charges bound over for trial[.]" Petition for Writ of *Habeas Corpus* at 14.[2]

**2.** Appellant also asserted that the MDJ abused his discretion by refusing the request for a

continuance so that the troopers who were present during the shooting could be called by

The court of common pleas denied relief on the petition, reasoning that the Commonwealth simply did not rely exclusively on hearsay at the preliminary hearing. The court explained:

> At the preliminary hearing, Trooper Kelley testified that in his presence Appellant stated that he did not understand why the trooper did not leave and get a warrant. Appellant also stated that he was in his garage holding the AK–47 when he was shot. These admissions to Trooper Kelley were presented along with evidence regarding the seizure of eighty firearms from the home ... and cartridge cases in the garage consistent with being discharged from an AK–47. Since the admissions and the products of the search were presented at the preliminary hearing, the Commonwealth did not rely solely on hearsay evidence as Appellant contends.

*Commonwealth v. Ricker*, No. CP–22–CR–0003601–2014, *slip op.* at 5 (Dauphin Cnty. Dec. 4, 2014). The court also highlighted Rule 542(E)'s express authorization of hearsay in preliminary hearings.

In terms of the right of confrontation, the county court related that this is a trial right. *See id.* at 6 (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 52, 107 S.Ct. 989, 999, 94 L.Ed.2d 40 (1987) (plurality)). The function of a preliminary hearing, the court continued, is to determine whether a *prima facie* case has been made out against the accused. *See id.*

On Appellant's interlocutory appeal, the Superior Court affirmed. *See Ricker*, 120 A.3d at 351.[3] Initially, the panel considered whether the Commonwealth proffered hearsay alone. While recognizing that the prosecution had offered some direct evidence, in the form of Trooper Kelley's testimony about his investigation, the panel nevertheless opined that none of this was sufficient to establish the elements of the crimes charged. *See id.* at 356. For this reason, in the panel's judgment, "hearsay alone was used to prove a *prima facie* case." *Id.* In this particular passage of its opinion, the panel implied that the Commonwealth must adduce enough direct evidence at a preliminary hearing to satisfy all elements of the charged offenses, and that, if hearsay is adduced, it may only be supplementary.[4]

In terms of Rule 542(E), the panel found that its provision requiring hearsay to be considered in assessing whether the Com-

---

the defense as witnesses. On appeal, the Superior Court found this challenge to have been waived, *see Ricker*, 120 A.3d at 364; the question was not framed in Appellant's petition for allowance of appeal; and no further discussion of it is offered here.

3. The Superior Court determined that interlocutory appellate review was appropriate, since the issue presented was significant and capable of repetition and likely to evade review. *See id.* at 353–54 (citing *Commonwealth v. Hess*, 489 Pa. 580, 589, 414 A.2d 1043, 1047–48 (1980), for the proposition that exceptional circumstances may justify an interlocutory appeal from the denial of a pretrial petition for a writ of *habeas corpus*). *See generally* Tracy Bateman Farrell, *et al.*, 26A Standard Pa. Prac. 2D § 132:576 (2017). This facet of the court's opinion is extraneous to the issue on which allocatur was granted, and I do not consider it here.

4. This reasoning, of course, is in apparent conflict with Rule 542(E)'s prescription that "[h]earsay as provided by law *shall be considered* by the issuing authority in *determining whether a prima facie case has been established.*" Pa.R.Crim.P. 542(E) (emphasis added). Moreover, it also contradicts the panel's apparent acceptance, otherwise in its opinion, that the Commonwealth may rely upon hearsay as a component of its *prima facie* case. *See, e.g., Ricker*, 120 A.3d at 357 ("If hearsay evidence *is sufficient to establish one or more elements of the crime*, it follows that, under the rule, it is sufficient to meet all of the elements." (emphasis added)).

monwealth has met its burden implicitly authorizes the use of hearsay alone at a preliminary hearing to satisfy the Commonwealth's entire burden of proof. *See id.* at 357 (reasoning that, if hearsay evidence can be sufficient to meet one or more elements of a crime, "it follows that, under the rule, *it is sufficient to meet all of the elements*" (emphasis added)).

Turning to the constitutional issue involving the right of confrontation, the panel offered an extensive discussion of the history of preliminary hearings in the Commonwealth, concluding with the assessment that Pennsylvania courts, historically, had found no constitutional right of confrontation extending to preliminary hearings. *See id.* at 358–60.

The panel then considered the plurality decision in *Verbonitz*, 525 Pa. 413, 581 A.2d 172, in which a majority of Justices agreed that hearsay alone was insufficient to satisfy the Commonwealth's burden at a preliminary hearing. The lead Justices, the panel explained, concluded that a preliminary hearing is a critical stage of a criminal proceeding and, as such, the right of confrontation attaches. *See id.* at 361 (citing *Verbonitz*, 525 Pa. at 417–18, 581 A.2d at 174). The panel observed that the same Justices also construed the term "criminal prosecutions" in the Pennsylvania Constitution as encompassing preliminary hearings, thus implicating the right to confront witnesses. *See id.* (referring to *Verbonitz*, 525 Pa. at 419, 581 A.2d at 175). Additionally, the panel noted that Justice Flaherty, who supplied a fourth vote in support of the outcome, took the position that "fundamental due process requires that no adjudication be based solely on hearsay evidence." *Id.* (quoting *Verbonitz*, 525 Pa. at 419–21, 581 A.2d at 175–76 (Flaherty, J.,

concurring)).[5] Given the plurality status of *Verbonitz*, however, the panel declined to afford it controlling significance.

The panel also found the admission of hearsay at a preliminary hearing designed to assess *prima facie* proof to be in tension with dictum from the United States Supreme Court's decision in *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). In that case, the Supreme Court initially explained that the federal Constitution does not require the full panoply of adversary safeguards attending trial at a preliminary hearing directed to determining probable cause for purposes of assessing the propriety of pretrial detention. *See id.* at 120, 95 S.Ct. at 866 ("[P]robable cause to believe the suspect has committed a crime ... traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony, and the Court has approved these informal modes of proof."). However, the *Gerstein* Court undertook to distinguish preliminary hearings serving broader purposes, to which higher standards of proof pertain. *See id.* at 122–23, 95 S.Ct. at 867–68 (citing *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970)). Ultimately, the Superior Court panel reasoned that "*Gerstein* ... suggests but does not· hold that a federal constitutional right to confront witnesses exists at the type of preliminary hearing used in Pennsylvania." *Ricker*, 120 A.3d at 362.

In the final passages of its opinion, the Superior Court panel accorded deference to Rule 542(E) and, concomitantly, to this Court as the rule-maker. The panel highlighted the absence of any binding precedent affording a defendant a right to

---

**5.** Notably, the lead Justices in *Verbonitz* would appear also to have briefly invoked a due process rationale relative to the proposition that hearsay alone is insufficient. *See Verbonitz*, 525 Pa. at 417, 581 A.2d at 174.

cross-examine witnesses at a preliminary hearing. Moreover, the panel emphasized that, at the time of the ratification of the federal and early Pennsylvania Constitutions, the concept of "criminal prosecutions" did not encompass preliminary hearings, and there was no such right afforded at grand jury proceedings initiated subsequent to preliminary hearings. *Id.* at 363.

Finally, the panel recognized that there is some tension between Rule 542(C)'s conferral of a rule-based right to cross-examine and Rule 542(E)'s approval of hearsay. The panel commented, however, that Appellant had not explored this issue, and accordingly, it provided no further assessment. *See id.* at 364.

Appellant filed a petition for allowance of appeal, which this Court granted, framing the questions presented as follows:

> Whether the Pennsylvania Superior Court wrongly held, in a published opinion of first impression, that a defendant does not have a state or federal constitutional right to confront the witness against him at a preliminary hearing and that a *prima facie* case may be proven by the Commonwealth through hearsay evidence alone, which is what the trial and magisterial district courts concluded in Petitioner's case?

*Commonwealth v. Ricker*, 635 Pa. 255, 135 A.3d 175 (2016) (*per curiam*).

Presently, Appellant maintains that the Commonwealth inappropriately relied exclusively upon hearsay at the preliminary hearing. *See, e.g.*, Brief for Appellant at 24, 31–32 ("The only evidence adduced by the Commonwealth ... going to the crimes' essential elements was the tape-recorded interview with Trooper Trotta, which was 'rank hearsay.'" (quoting *Verbonitz*, 525 Pa. at 417, 581 A.2d at 174) (quoting *UCBR v. Ceja*, 493 Pa. 588, 619, 427 A.2d 631, 647 (1981) (plurality))). It is Appellant's position that, to establish a *prima facie* case, each and every element of the crimes charged must be proven by the prosecution through legally competent evidence. *See id.* at 25. Appellant relies substantially upon *Verbonitz* for the proposition that hearsay alone simply cannot be employed to satisfy such burden. He also asserts that Rule of Criminal Procedure 542 should be read to preclude reliance upon only hearsay. *See id.* at 30; *see also* Brief for *Amicus Curiae* Defender Ass'n of Phila. at 7–11.

Appellant continues to accept that some hearsay evidence is admissible at preliminary hearings, but he posits that the presentation of certain witnesses is essential. He offers the following remarks to illustrate this position:

> Undersigned counsel does not contend that there should be an unrestricted right of confrontation at a preliminary hearing and hearsay evidence would continue to be admissible, particularly as to forensic evidence (e.g., lab reports, pathologist opinions, DNA results, BAC levels, etc.). However, as to crimes against persons (such as homicide, assault, robbery, sex crimes, etc.) as opposed to property-related offenses (theft, forgery, burglary, etc.), the alleged victim or victims must be in attendance and testify on both direct—and cross-examination in order for the evidence against a defendant to be tested.

Brief for Appellant at 32–33. As to his own preliminary hearing, Appellant claims that "the only way for the Commonwealth to prove a *prima facie* case of the essential elements of the three crimes [charged]—absent hearsay evidence—would have been through the direct testimony of [Trooper Trotta] and the trooper who eyewitnessed the shootings." Brief for Appellant at 31.

In terms of the right of confrontation, Appellant recognizes that preliminary

hearings in Pennsylvania are directed to addressing the lawfulness of pretrial custody for Fourth Amendment purposes. *See* Brief for Appellant at 22–23 (citing *McBride*, 528 Pa. at 158, 595 A.2d at 591). Nevertheless, his brief implies that the *prima facie* standard imposes a higher threshold than the probable-cause litmus serving as the constitutional floor relative to the salient Fourth Amendment concerns. In this regard, Appellant also references *Commonwealth v. Wojdak*, 502 Pa. 359, 466 A.2d 991 (1983) (plurality), for the proposition that the Commonwealth's burden is to "present admissible evidence at the preliminary hearing that would warrant a reasonable jury in finding each of the elements of the offense [beyond a reasonable doubt]." Brief for Appellant at 23 (citing, indirectly, to *Wojdak*). Appellant also highlights that, in *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), the Supreme Court determined that a preliminary hearing afforded in Alabama comprised a critical stage of the proceedings for purposes of the Sixth Amendment right to counsel. *See id.* at 9–10, 90 S.Ct. at 2003.

Appellant supplements his presentation with an argument under the Due Process Clauses of the federal and state Constitutions. While he acknowledges that this exceeds the scope of the allocatur grant and what had been presented initially, Appellant indicates that the claim is closely related to his confrontation challenge and that the Commonwealth also wishes for this Court to review it presently.

In reply, the Commonwealth maintains that it did not rely solely on hearsay evidence at Appellant's preliminary hearing, since it offered Trooper Kelley's testimony that he observed Trooper Trotta's gunshot wounds, seized packaged marijuana and weapons from Appellant's residence, and viewed spent cartridges in the vicinity of the location where the rifle was found. *See* Brief for Appellee at 7, 21. The Commonwealth also highlights Appellant's admission that he was in possession of an AK–47 rifle when he was shot. *See id.*

Further, the Commonwealth takes the position that, under Rule 542(E), hearsay evidence is *per se* admissible at a preliminary hearing and can be used to satisfy any and all elements of the prosecution's burden. The Commonwealth emphasizes that jurists who preside at preliminary hearings do not evaluate credibility, but rather, make a legal, sufficiency-based determination. *See* Brief for Appellee at 10 (citing, *inter alia, Liciaga v. Court of Common Pleas of Lehigh Cty.*, 523 Pa. 258, 263, 566 A.2d 246, 248 (1989)). As to *Verbonitz*, the Commonwealth regards the plurality decision as non-binding and poorly reasoned.

Finally, the Commonwealth asserts that the constitutional right of confrontation is a trial right that simply does not extend to a preliminary hearing. *See* Brief for Appellee at 13–14 (citing *Ritchie*, 480 U.S. at 52, 107 S.Ct. at 999 (plurality)). It also observes that hearsay evidence is routinely admitted to establish probable cause at preliminary hearings and grand jury proceedings in the federal courts, per Federal Rule of Evidence 1101(d)(3). *See generally* Wayne R. Lafave, *et al.*, 4 Crim. Proc. § 14.4(b) (4th ed. 2016) (explaining that a potential majority of jurisdictions "start from the premise that the rules of evidence do not apply to the preliminary hearing").

## I. Hearsay Alone

Upon review, and as previously noted, I agree with the Commonwealth that the prosecution did not rely exclusively on hearsay in addressing the elements of the crimes with which Appellant was charged. Rather, the district attorney adduced live

testimony from an investigating trooper: confirming from visual observation at the hospital that the injured officer suffered from gunshot wounds; relating that the investigating trooper had observed Appellant in the hospital, who also had been shot; explaining that the trooper witnessed Appellant's statement that he had been in his garage holding the AK–47 assault rifle at the time of the shooting incident;[6] and attesting to the trooper's personal observation of an AK–47 near that garage. *See* N.T., July 10, 2014, at 5–10. Significantly, as well, at the conclusion of the preliminary hearing, the defense conceded, as the direct proofs amply evidenced, that Appellant had shot the injured officer, while offering a justification defense. *See id.* at 45, 107 S.Ct. 989, 999.

In delineating the elements of crimes, this Court distinguishes between the *actus reus* element and *mens rea*.[7] Very plainly,

the Commonwealth adduced direct evidence establishing a *prima facie* case of one element, namely, the *actus reus*, of each of the three offenses in question—attempted murder, assault of a law enforcement officer, and aggravated assault. Accordingly, since the *prima facie* case was not advanced through hearsay evidence alone, this case does not present a suitable vehicle for this Court to address the question of whether the Commonwealth may rely exclusively upon hearsay.[8]

## II. Confrontation

Regarding the right of confrontation, initially, I note that there are aspects of the Superior Court's opinion with which I do not agree. *See, e.g., supra* note 4. Primarily, I am concerned that the panel did not adequately address what it means to present a *prima facie* case in Pennsylvania and how this may contrast with the law in

---

6. Although Appellant's statement is hearsay under Pennsylvania law, *see* Pa.R.E. 803(25), it is not of a type that implicates a defendant's confrontation rights. *See generally United States v. Brown*, 441 F.3d 1330, 1359 (11th Cir. 2006) (citing 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 802.05[3][d] at 802–25 (2d ed. 2005), for the proposition that "a party cannot seriously claim that his or her own statement should be excluded because it was not made under oath or subject to cross-examination").

7. *See, e.g., Commonwealth v. Shaw*, 560 Pa. 296, 304, 744 A.2d 739, 743 (2000) (adopting a formulation from *Commonwealth v. Bolden*, 367 Pa.Super. 333, 532 A.2d 1172 (1987), in determining equivalency of in-state versus out-of-state offenses for purposes of sentencing, requiring courts to "identify the requisite elements of the crime—the actus reus and mens rea—which form the basis of liability"). *See generally* 21 AM. JUR. 2D CRIMINAL LAW § 112 (2017) ("A crime generally consists of two elements, a physical, wrongful deed (the 'actus reus'), and a guilty mind that produces the act (the 'mens rea')."); *accord* Paul H. Robinson, 1 CRIM. L. DEF. § 11 (2016) ("The elements of an offense are of two 'sorts: objective

criteria (actus reus elements) and culpability requirements (including primarily mens rea elements)." (footnotes omitted)).

8. In terms of *mens rea*, the investigating trooper further testified that substantial quantities of marijuana and a large cache of weapons were found in Appellant's residence, thus also tending to demonstrate a consciousness-of-guilt rationale motivating the shooting. Although this does not bear controlling relevance on the question of whether the Commonwealth proceeded with its overall case solely on the basis of hearsay, it is noteworthy that the Commonwealth did not proceed on such basis relative to *mens rea* elements either.

Self-evidently, I differ strongly with Justice Wecht's assertion that the uncontested evidence presented through Trooper Kelley's testimony that Appellant shot a law enforcement officer is somehow "tangential," "merely corroborat[ive]," or "surplusage." Dissenting Statement at 507–08 (Wecht, J.). The dissent references no authority that would suggest that direct evidence of crime elements presented by the Commonwealth at a preliminary hearing should be downplayed and subordinated in such a fashion.

other jurisdictions expressly limiting the determination at preliminary hearings to probable cause. For example, in its discussion of the United States Supreme Court's *Gerstein* decision, the panel implied that the *prima facie* standard sets Pennsylvania apart from other jurisdictions, *Ricker*, 120 A.3d at 362, but the panel proceeded to cite exclusively to jurisdictions applying a pure probable cause standard in opining that its "conclusion [pertaining to Pennsylvania's *prima facie* standard] is consistent with a large body of other precedent." *Id.* n.8.[9]

Defining the *prima facie* standard is not without its complications, particularly given the varying expressions of this Court. Under the ordinary definition, presentation of a *prima facie* case entails "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Prima Facie Case*, BLACK'S LAW DICTIONARY (10th ed. 2014). Indeed, this Court has employed this formulation in various cases. *See, e.g., Commonwealth v. Karetny*, 583 Pa. 514, 529, 880 A.2d 505, 514 (2005) (depicting the Commonwealth burden at a preliminary hearing as to adduce enough evidence such that, "if presented at trial and accepted as true, the judge would be warranted in permitting the case to be decided by the

jury" (citing *Commonwealth v. Huggins*, 575 Pa. 395, 402, 836 A.2d 862, 866 (2003))). Nevertheless, the Court has also said that the "sole function" of the jurist presiding at a preliminary hearing is "to determine whether probable cause exists to require an accused to stand trial on the charges contained in the complaint." *McBride*, 528 Pa. at 160, 595 A.2d at 592 (citing *Commonwealth v. Prado*, 481 Pa. 485, 489, 393 A.2d 8, 10 (1978)).[10]

From some other of this Court's formulations, one might alternatively infer that the *prima facie* burden attaches only to the facet of the Commonwealth's obligation to prove that a crime has been committed, and that a separate probable cause standard pertains to demonstrating that the defendant was the perpetrator. *See, e.g., Huggins*, 575 Pa. at 402, 836 A.2d at 866 ("A *prima facie* case exists when the Commonwealth produces evidence of each of the material elements of the crime charged and establishes sufficient probable cause to warrant the belief that the accused committed the offense."). The Court has never explained, however, why any greater importance would attach to establishing abstract crime commission as compared to the defendant's participation, in terms of the salient Fourth Amendment interests involved.[11]

9. I have confirmed that none of the decisions from other jurisdictions cited in footnote 8 of the Superior Court's opinion applies a *prima facie* standard. Rather, they all apply the Fourth–Amendment-based probable cause standard.

10. The frequently cited plurality decision in *Wojdak* appears to equate probable cause with proofs that "if presented at the trial in court, and accepted as true, the judge would be warranted in allowing the case to go to a jury." *Wojdak*, 502 Pa. at 368, 466 A.2d at 996 (emphasis omitted) (quoting *Commonwealth ex rel. Scolio v. Hess*, 149 Pa.Super. 371, 375, 27 A.2d 705, 707 (1942)). As explained by other courts, however, this classic formula-

tion of a *prima facie* case differs materially from a conventional probable cause standard. *See, e.g., Stewart v. Abraham*, 275 F.3d 220, 229–30 (3d Cir. 2001); *accord Gerstein*, 420 U.S. at 119–20, 95 S.Ct. at 866 (distinguishing probable cause hearings from those requiring *prima facie* proofs).

11. Notably, moreover, the applicable Rules of Criminal Procedure do not distinguish between abstract crime commission and identity in terms of the applicable standard at preliminary hearings. *See, e.g., Pa.R.Crim.P.* 542(D) ("At the preliminary hearing, the issuing authority shall determine from the evidence presented whether there is a *prima facie* case that (1) an offense has been committed and

The Court, of course, must squarely resolve the ambiguity in terms of what is required of the Commonwealth before it can determine whether, or to what extent, the constitutional right of confrontation attaches. This is so, since the Supreme Court of the United States has indicated, essentially, that the closer in resemblance a pretrial procedure is to a trial, the more likely it is that trial rights will attach. *See Gerstein*, 420 U.S. at 122–23, 95 S.Ct. at 867–68. This consideration, however, is not sharply developed in the briefing, and the Court presently is deeply divided concerning the appropriate approach. For these reasons, I elect not the proceed further at the present with the Confrontation Clause analysis in this case, or the due process analysis which, as Appellant correctly explains, is closely related.[12]

When the Court does consider the issue of the Commonwealth's burden, either in a future case or through the rulemaking process, I share the concern of the Supreme Court of the United States with controlling the burden upon the criminal justice system imposed by pretrial hearings. *See Gerstein*, 420 U.S. at 122 & n.23, 95 S.Ct. at 867 & n.23. In this regard, I find it significant that the Supreme Court has indicated that states have some flexibility to experiment with the appropriate balance to be stricken. *See id.* at 123–24, 95 S.Ct. at 868. Accordingly, some balancing of the respective, vital interests of criminal defendants and the Commonwealth should be considered.[13] It must also be borne in mind that preliminary hearings in Pennsylvania do not implicate "the fine resolution of conflicting evidence that a reasonable-doubt

---

(2) the defendant has committed it."); *id.* 543(B) ("If the issuing authority finds that the Commonwealth has established a *prima facie* case that an offense has been committed and the defendant has committed it, the issuing authority shall hold the defendant for court on the offense(s) on which the Commonwealth has established a *prima facie* case.").

To the extent that some other jurisdiction had recognized a difference between identity and abstract crime commission, the modern trend has been to move away from such distinctions. *See, e.g., Sheriff, Washoe Cty. v. Middleton*, 112 Nev. 956, 921 P.2d 282, 286 (1996) ("[W]e now clarify that at the preliminary hearing stage, the state's burden with respect to the *corpus delicti* is the same as its burden to show probable cause. The state must present evidence supporting a 'reasonable inference' of death by criminal agency."); *State v. Jones ex rel. Cty. of Maricopa*, 198 Ariz. 18, 6 P.3d 323, 329 (App. 2000) ("Given that the purpose of the preliminary hearing is to determine whether probable cause exists to bind the defendant over to the superior court and that it is not a resolution of the merits of the charge(s), the justification for the *corpus delicti* rule is not pertinent.").

12. I do note that the United States Supreme Court has, on various occasions, warned

against interference in matters of state criminal procedure under the auspices of the Due Process Clause. *See, e.g., Medina v. California*, 505 U.S. 437, 443–44, 112 S.Ct. 2572, 2576, 120 L.Ed.2d 353 (1992) ("[I]t has never been thought that decisions under the Due Process Clause establish this Court as a rule-making organ for the promulgation of state rules of criminal procedure." (alterations, internal citations and quotation marks omitted)); *Patterson v. New York*, 432 U.S. 197, 201–02, 97 S.Ct. 2319, 2322, 53 L.Ed.2d 281 (1977) (cautioning that, "we should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States" and explaining that "it is normally within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion, and its decision in this regard is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" (internal citations and quotation marks omitted)).

13. In this regard, the Commonwealth highlights that, per relatively recent amendments to the Pennsylvania Constitution, like criminal defendants, it enjoys a right to a jury trial. *See* PA. CONST., art. I, § 6.

or even a preponderance standard demands," *Gerstein*, 420 U.S. at 121, 95 S.Ct. at 867, a point which the Supreme Court found to be material in determining the degree of constitutionally required safeguards. *Accord McBride*, 528 Pa. at 157–58, 595 A.2d at 591 (emphasizing the preliminary hearings are not to be converted into guilt-based mini-trials).

Furthermore, contrary to Appellant's position, I wish to emphasize that the Commonwealth is not obliged to present particular witnesses or all of its witnesses, but rather, must merely establish a *prima facie* case.[14] Defendants, on the other hand, have a rule-based right to cross-examine the witnesses that the Commonwealth does present at preliminary hearings and to offer their own witnesses, subject, at least to some degree, to the presiding jurist's discretion and within reason. *See* Pa.R.Crim.P. 542(C). Of course, the defendant's core Fourth Amendment interests must be fully vindicated, per governing federal and state constitutional law.

Addressing the constitutional requirement of confrontation will also require a determination of the extent to which the rights to counsel and to cross-examination intersect. In this regard, it is noteworthy that several of the seminal decisions of the United States Supreme Court that are cited here involve the right to counsel. *See, e.g., Coleman*, 399 U.S. 1, 90 S.Ct. 1999. However, the analytical framework and

underlying justification for the two discrete Sixth Amendment rights differ substantially. The primary objective of the right to counsel is to guarantee "counsel's assistance whenever necessary to assure a meaningful 'defence[,]' " *United States v. Wade*, 388 U.S. 218, 225, 87 S.Ct. 1926, 1931, 18 L.Ed.2d 1149 (1967), and, indeed, this right may attach as early as a pre-indictment lineup. *See Commonwealth v. Richman*, 458 Pa. 167, 172, 320 A.2d 351, 353 (1974). Conversely, the Confrontation Clause is a procedural guarantee preventing the "use of *ex parte* examinations as evidence against the accused," *Crawford v. Washington*, 541 U.S. 36, 50, 124 S.Ct. 1354, 1363, 158 L.Ed.2d 177 (2004),[15] and this right has repeatedly been characterized as "a trial right." *Ritchie*, 480 U.S. at 52, 107 S.Ct. at 999, ("The opinions of this Court show that the right to confrontation is a *trial* right[.]" (emphasis in original)). Notably, Appellant has referenced no cases treating these two rights conterminously.

Moreover, assuming, *arguendo*, that the Confrontation Clause is applicable in the preliminary hearing context, future advocacy should take into account its limited scope. In *Crawford*, the United States Supreme Court held that the constitutional right to confront a witness will only bar hearsay evidence that is "testimonial" in nature. *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364. Although the precise contours re-

---

14. Under Appellant's approach requiring the Commonwealth to present the eyewitnesses, a defendant could not be tried if they were unavailable. This certainly is not the law, as, for example, the Commonwealth may secure a criminal conviction based on circumstantial evidence. *See, e.g., McBride*, 528 Pa. at 159 n.7, 595 A.2d at 592 n.7. So too may it prevail via the presentation of sufficient circumstantial evidence as a *prima facie* showing at a preliminary hearing.

15. *See also Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895) (explaining that one of the primary purposes of the Confrontation Clause is to force the accuser "to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand ... whether he is worthy of belief").

main somewhat nebulous,[16] the Court has identified several categories of hearsay evidence that are nontestimonial and, thus, fall outside the protective realm of the clause, including, *inter alia*: statements obtained for the "primary purpose" of responding to an emergency;[17] statements made by a witness who the defendant intentionally rendered unavailable;[18] business and public records, provided that they were not created "for the purpose of establishing or proving some fact at trial," *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324, 129 S.Ct. 2527, 2539–40, 174 L.Ed.2d 314 (2009); "off-hand [or] overheard remark[s]," *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364; and "[s]tatements to friends and neighbors about abuse and intimidation," *Giles*, 554 U.S. at 376, 128 S.Ct. at 2692–93.

To the degree that this Court is to provide meaningful guidance concerning the use of hearsay evidence vis-à-vis a defendant's interests, I believe that it is likely that we will also consider the character of the expected proffer in terms of focus, quality (or reliability), and/or quantity. The opinions in *Ceja*, 493 Pa. 588, 427 A.2d 631, arising out of the use of hearsay in administrative proceedings, provide salient expositions of relevant considerations. *See, e.g., id.* at 594–612, 427 A.2d at 634–44. In the absence of such a review, I decline at this time to endorse bright-line authorization or disapproval.

### III. Rule 542(E) and Conclusion

Finally, and candidly, I recognize that the applicable rules are not models of clarity, as, for example, the directive to accept hearsay evidence in Rule 542(E) appears to clash with the rule-based right to cross-examine witnesses against the defendant conferred under Rule 542(C).[19] I also ac-

---

16. *See, e.g., id.* at 51–52, 124 S.Ct. at 1364 (positing that the assessment may require focusing on differing aspects of the circumstances in which the statement was made, including the degree of formality, the declarant's objective belief as to the purpose for which the statement was taken, and the nature and extent of police involvement); *see also Michigan v. Bryant*, 562 U.S. 344, 367, 131 S.Ct. 1143, 1160, 179 L.Ed.2d 93 (2011) (suggesting that the "primary purpose of the interrogation" is the touchstone).

17. *See Bryant*, 562 U.S. at 358, 131 S.Ct. at 1155; *see also Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006) ("Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."). Notably, this principle has been interpreted rather broadly. *See Ohio v. Clark*, —— U.S. ——, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015) (holding that a three-year-old boy's statements regarding the source of his injuries and identity of his abuser were not testimonial because the pre-school teacher and her supervisor obtained the statements in an effort to respond to an emergency).

18. *See Giles v. California*, 554 U.S. 353, 361, 128 S.Ct. 2678, 2684, 171 L.Ed.2d 488 (2008) (holding that the Confrontation Clause will not preclude hearsay testimony if "defendant intended to prevent a witness from testifying").

19. That said, the amendatory hearsay references, being later in time and more specific, were plainly intended to control over the general authorization of cross-examination. Nevertheless, it is preferable for the rule to be adjusted to eliminate the facial incongruity. For example, and without endorsing the specific approach, the Arizona Rules of Criminal Procedure provide a more developed description of what is permitted and expected of the participants in a preliminary hearing, as follows:

The preliminary hearing shall be held before a magistrate who shall admit only such evidence as is material to the question whether probable cause exists to hold the defendant for trial. All parties shall have the right to cross-examine the witnesses testifying personally against them, and to review their previous written statements prior to such cross-examination. At the close of the prosecution's case, including cross-exami-

knowledge that the hearsay-related amendments were not promulgated under ideal circumstances and that further reflection and refinement in the rulemaking arena is warranted.

From my perspective, the 2013 amendment to the rule (which expanded the range of express permission for the use of hearsay evidence beyond establishing elements requiring proof of ownership of, non-permitted use of, damage to, or value of property) was not intended to convey that the Commonwealth could meet its burden at a preliminary hearing entirely through hearsay evidence. Rather, I believe the revision served only as an attempt to clarify that the 2011 amendment to the rule had not restricted the Commonwealth's ability to adduce hearsay evidence at preliminary hearings solely to offense elements requiring proof of ownership, non-permitted use, damage, or value of property.[20] Given that there is no public deliberative history of the amendment, the most I am able to say is that, in supporting the revision, I personally operated on the

belief that the Court was not rejecting *Commonwealth ex rel. Buchanan v. Verbonitz*, 525 Pa. 413, 581 A.2d 172 (1990) (plurality), but rather, was simply putting the attendant controversy aside for future consideration in the case law.

## DISSENTING STATEMENT

### JUSTICE WECHT

The Court dismisses this appeal as improvidently granted, because a majority of Justices now have concluded that the case presents a poor vehicle by which to review the use of hearsay evidence at preliminary hearings. The Court has determined that, because the Commonwealth introduced *some* non-hearsay evidence at David Ricker's preliminary hearing, we should await a case in which the issue is more suitably presented. I respectfully disagree.

The Commonwealth's *prima facie* case was premised upon, and, for all practical purposes constructed entirely by, Trooper Michael Trotta's taped interview. At the

---

nation of prosecution witnesses by the defendant, the magistrate shall determine and state for the record whether the prosecution's case establishes probable cause. The defendant may then make a specific offer of proof, including the names of witnesses who would testify or produce the evidence offered. The magistrate shall allow the defendant to present the offered evidence, unless the magistrate determines that it would be insufficient to rebut the finding of probable cause.

*Brailsford v. Foster*, 242 Ariz. 77, 393 P.3d 138, 143 (App. 2017) (quoting Ariz.R.Crim.P. 5.3).

20. The 2011 amendment was publicly premised on an effort, spearheaded by several former Justices, to address criticisms of the Philadelphia criminal court system, including those about high dismissal rates due to the absence of fact witnesses at preliminary hearings. *See, e.g.*, Craig R. McCoy, Nancy Phillips & Dylan Purcell, *Justice: Delayed, Dismissed, Denied*, PHILA. INQUIRER (Dec. 13, 2009), http://

www.philly.com/philly/news/special_packages/20091213_Justice_Delayed_Dismissed_Denied.html ("With Philadelphia's court system in disarray, cases crumble as witnesses fear reprisals ...."); Tony Romeo, *Top Pa. Judges Seek to Streamline Philadelphia's Court Process*, (Oct. 18, 2010) http://philadelphia.cbslocal.com/2010/10/18/top-pa-judges-seek-to-streamline-philadelphias-court-process ("Two Pennsylvania State Supreme Court justices are lobbying for a change that would eliminate the practice of requiring certain Philadelphia crime victims to testify at preliminary hearings."); Tom MacDonald, *Philadelphia Courts to Let Witnesses Skip Preliminary Hearings*, NEWSWORKS (Jan. 28, 2011), http://www.newsworks.org/index.php/local/item/12066-28tmcourt (reflecting a former Justice's comment that the 2011 rule amendment "will save literally thousands of victims from showing up at preliminary hearings from taking time off from their work, ... [t]housands of victims of losing time from their homes").

preliminary hearing, the crux of the prosecution's case was inadmissible hearsay. It is true that the Commonwealth presented live, non-hearsay testimony from Trooper Douglas Kelley. But this testimony was tangential; it merely corroborated elements of what the Commonwealth sought to prove through introduction of Trooper Trotta's taped interview. It also is true that Trooper Kelley's testimony *could* have established one or more elements in one or more of the three crimes for which David Ricker was charged. But that is not what happened.

At the preliminary hearing, Trooper Trotta's taped statement was the Commonwealth's proverbial star witness. Trooper Trotta's statement left no gaps to be filled in with other evidence. The non-hearsay testimony was surplusage.[1] Of course, it was well within the Commonwealth's discretion to introduce Trooper Kelley's testimony. However, while that testimony *could* have established some elements of the offenses, it is plain that it did not do so. From my review of the record, I fail to discern how we reasonably can conclude otherwise. The *prima facie* case was established exclusively by Trooper Trotta's taped interview. The fact that the Commonwealth introduced other material does not change this reality.

Perhaps the Court is correct that this case does not offer the optimal vehicle for analyzing the issue. Nonetheless, I believe that it is imprudent for us to decline review here. The question presented is "one of such substantial public importance as to require prompt and definitive resolution by the Pennsylvania Supreme Court." *See* Pa. R.A.P. 1114(b)(4). While this provision of our rules guides our decisions on whether to grant review in a case, its principle is equally compelling when we consider whether to dismiss an appeal as improvidently granted. Thousands of preliminary hearings occur across this Commonwealth each year. Query: How will those proceedings be conducted and governed, and for how long, until the very best vehicle arrives at this Court for review? To the extent that the Superior Court erred in this case, and I believe that it did, its error will be replicated and imposed upon every defendant in this Commonwealth until the best case arrives on our doorstep. The issue is adequately preserved and presented, and should not be left on a back burner to await resolution at some unknown point in the future.

The Superior Court's decision here permits *prima facie* cases to be built exclusively upon hearsay. Consider the consequences of that decision, which will continue, and which may be exacerbated,

---

1. Chief Justice Saylor criticizes my characterization of Trooper Kelley's testimony, and highlights the lack of authority to support what he perceives as my effort to "downplay" or "subordinate" that non-hearsay evidence. *See* Concurring Statement at 502–03 n.8. This criticism misconstrues my point. I neither make, nor intend, any argument to "downplay" (or "up-play") any evidence. What I *am* doing is simply viewing the preliminary hearing, and the Commonwealth's clear objective at that hearing, in a realistic manner in light of what is plain from the record. My review of that record makes patently clear that the Commonwealth sought to establish its *prima*

*facie* case through Trooper Trotta's taped statement. The remainder of the evidence (*i.e.* Trooper Kelley's testimony) was used merely to bolster that hearsay evidence, and to corroborate it, but quite obviously not to establish any elements on its own. To view the matter otherwise, as the learned Chief Justice does, elevates the non-hearsay to a level unintended by the Commonwealth and presses it into service now in a manner belied by the record of how the hearing actually occurred. The result allows the Commonwealth to insulate its case from meaningful challenge by a defendant and prevents this Court from considering the constitutionality of a hearing conducted in the fashion that occurred here.

as we await the best case. Magisterial district judges will be unable to fulfill their essential role of determining whether the Commonwealth has presented enough evidence to detain the accused. Defendants will be subjected to extensive periods of pretrial incarceration that later may prove to have been unnecessary. Neither the Commonwealth nor the defendant will gain a fair assessment of the strength of the case going forward. The defendant will be stripped of a fair opportunity to test the Commonwealth's case via his or her rule-based right to cross-examination, to direct his or her pretrial investigation, to exercise his or her constitutional right to an attorney in a meaningful fashion, and to consider intelligently his or her options to plead guilty or to proceed with a jury trial or a non-jury trial.

And there is a still larger problem that follows from the Court's dismissal. Not only will the Superior Court's decision fundamentally alter the preliminary hearing; as well, today's result effectively hands the Commonwealth a blueprint for ensuring that cases are constructed in such a way as to perpetually avoid review of the question presented in this case. Henceforth, the Commonwealth can present inadmissible hearsay to establish every element of every crime charged. The Commonwealth then can call one live witness to testify as to any tangential, corroborative fact, no matter how obvious or duplicative. For instance, in a murder case, the Commonwealth can call one police officer to say that he or she saw the victim's corpse in the morgue, even though this fact was already established through hearsay. So long as that one additional fact *could* touch upon or establish any element of the crimes charged, the *prima facie* question will forever be able to avoid our review, and the Superior Court's decision will re-

main the law of this Commonwealth, escaping our consideration in perpetuity.

Its facial appeal notwithstanding, the Court's decision necessarily induces these unfortunate results. Accordingly, I respectfully dissent. I would review the merits of the case, and I would reverse the Superior Court. My analysis follows.

### I.

In a criminal prosecution, the preliminary hearing is the first event at which the right to counsel attaches. *Coleman v. Alabama*, 399 U.S. 1, 9–10, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (plurality). It is the proceeding at which the Commonwealth must carry its first burden. The preliminary hearing is no mere formality. It is important to both the Commonwealth and the defendant. The preliminary hearing is essential to the functioning of a justice system that seeks to balance the Commonwealth's authority and obligation to prosecute crime against the accused's individual rights under our Constitutions.

At the preliminary hearing, the Commonwealth must appear before a neutral and detached magistrate and justify restraints of a person's liberty—restraints imposed by pretrial incarceration, by requiring a person to defend against criminal charges, or both. The Commonwealth must justify such restraints by establishing a *prima facie* case to the judicial officer's satisfaction. *See* Pa.R.Crim.P. 542(D). Although the burden is relatively low, it is nonetheless vital to our system of justice.

The question in this case is whether the Commonwealth can satisfy that burden on the basis of inadmissible hearsay evidence alone. The Superior Court decided that it may do so, concluding that Pa.R.Crim.P. 542(E) countenances a *prima facie* case established under such circumstances. This interpretation runs afoul of our constitutional requirements of due process and

fundamental fairness. It is unsustainable, as a matter of law.

## II.

The vast majority of criminal cases begin with the filing of a criminal complaint against an individual suspected of committing one or more criminal offenses. In most instances, the district attorney plays no part in the initial charging decision, which is made by a law enforcement officer. Nor does the prosecutor typically appear at the initial arraignment. Normally, the attorney for the Commonwealth involves himself or herself in a case for the first time at the preliminary hearing.

Rule 542 of the Pennsylvania Rules of Criminal Procedure governs those hearings. The rule, *inter alia*, authorizes the Commonwealth to "assume charge of the prosecution," and to "recommend to the issuing authority that the defendant be discharged or bound over to court." Pa. R.Crim.P. 542(A)(1)-(2). The rule also safeguards certain rights held by the defendant, including the right to "be represented by counsel" and to "cross-examine witnesses and inspect physical evidence offered against" him or her. *Id.* 542(C)(1)-(2). The defendant may call witnesses and offer physical evidence on his or her own behalf. *Id.* 542(C)(3)-(4).

The rule also sets forth the Commonwealth's burden of proof, mandating that an issuing authority may hold a defendant for trial only when the Commonwealth establishes a *prima facie* case demonstrating that "(1) an offense has been committed and (2) the defendant has committed it." *Id.* 542(D). Finally, the rule authorizes the Commonwealth to satisfy this burden, at least in part, through the use of hearsay. Rule 542(E) provides as follows:

Hearsay as provided by law shall be considered by the issuing authority in determining whether a *prima facie* case has been established. Hearsay evidence shall be sufficient to establish **any** element of an offense, including, but not limited to, those requiring proof of the ownership of, non-permitted use of, damage to, or value of property.

*Id.* 542(E) (boldface added for emphasis).

In this case, the Superior Court interpreted "any" to mean, effectively, one element, some elements, or all of the elements of a crime. The court opined that, "[i]f hearsay evidence is sufficient to establish one or more elements of the crime, it follows that under the rule, it is sufficient to meet all of the elements." *Commonwealth v. Ricker*, 120 A.3d 349, 357 (Pa. Super. 2015). Thus, concluded the Superior Court, Rule 542(E) permits the Commonwealth to establish a *prima facie* case premised exclusively upon hearsay evidence, even though that same body of evidence would not be admissible at a later trial.

## III.

Like the Superior Court, we must interpret the term "any" as it appears in Rule 542(E). In all matters involving statutory interpretation, we apply the Statutory Construction Act, 1 Pa.C.S. §§ 1501 *et seq.* The Act directs us to ascertain and effectuate the intent of the drafter of the relevant provision. 1 Pa.C.S. § 1921(a).[2] To accomplish that goal, we interpret the operative language not in isolation, but with reference to the context in which it appears. *See Consulting Eng'rs Council of Pa. v. State Architects Licensure Bd.*, 522 Pa. 204, 560 A.2d 1375, 1377 (1989). A

---

**2.** Generally, our rules of procedure are subject to the rules of statutory interpretation. *See* Pa.R.Crim.P. 101(C) ("To the extent practicable, these rules shall be construed in consonance with the rules of statutory construction.").

provision's plain language generally provides the best indication of the drafters' intent. *See, e.g., McGrory v. Dep't of Transp.*, 591 Pa. 56, 915 A.2d 1155, 1158 (2007); *Commonwealth v. Gilmour Mfg. Co.*, 573 Pa. 143, 822 A.2d 676, 679 (2003); *Pa. Fin. Responsibility Assigned Claims Plan v. English*, 541 Pa. 424, 664 A.2d 84, 87 (1995) ("Where the words of a statute are clear and free from ambiguity the legislative intent is to be gleaned from those very words."). Only where the words are ambiguous will we resort to other means for discerning legislative intent. 1 Pa.C.S. § 1921(c); *see In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 577 Pa. 231, 843 A.2d 1223, 1230 (2004) (citing *O'Rourke v. Pa. Dep't of Corr.*, 566 Pa. 161, 778 A.2d 1194, 1201 (2001) ("Only when the language of the statute is ambiguous does statutory construction become necessary.")).

The plain meaning of the term "any" sheds faint light on whether the rule was intended to allow a prosecutor to demonstrate a *prima facie* case based solely upon otherwise inadmissible hearsay. In the Superior Court's view, "any" reasonably could mean "every" or "all." This is a reasonable interpretation, one that comports generally with dictionary definitions. Merriam–Webster's dictionary defines "any" in a number of ways, including "one or some indiscriminately of whatever kind" and "one, some, or all indiscriminately of whatever quantity." [3]

On the other hand, it would be reasonable as well to interpret "any" in a more restrictive, singular sense. A simple hypothetical will illustrate the point. The setting is a law firm. In an effort to ingratiate himself with his older colleagues, one young associate shows up for work on a Friday with a dozen doughnuts, and sends out an email reading "I brought doughnuts

today. Please help yourself to any that you like." Inside the box are three different kinds of doughnuts: glazed, chocolate-sprinkled, and cream-filled. Lawyer A walks up and selects one glazed doughnut, reasonably believing that "any" meant "any one" particular doughnut. However, imagine that Lawyer B was the first to the box, and he decided to take two glazed doughnuts and two chocolate-sprinkled doughnuts. Lawyer B, also reasonably, interpreted "any" to mean "some" or "as many as," because each doughnut fairly can be considered "any" doughnut. The first glazed is "any", as is the second glazed, and as is each of the two chocolate-sprinkled doughnuts. Now, suppose instead that Lawyer C is the first to the box, and that he takes all of the doughnuts. Every one of them is a doughnut that he likes, and there was no limit suggested on the amount of doughnuts that he could take. In fact, he was told that he could take "any" of them. In his view, "any" meant "all," which he happens to know is also the precise meaning ascribed to the term by the Superior Court of Pennsylvania.

Both the Superior Court's interpretation and the above hypothetical demonstrate the interpretive complexities attending the term "any," with its several common usages. Preeminent lexicographer and legal writing maven Bryan Garner, undoubtedly recognizing these complexities and usages, has described the numerous "uses and meanings" of "any" as follows:

As an adjective, *any* has essentially six uses. (1) The most common occurrence is in conditional, hypothetical, and interrogative sentences, where *any* means "a (no matter which)" or "some" <if you have any salt, I'd like to borrow some> <if any problem were to arise, what

---

**3.** *See* https://www.merriam-webster.com/ dictionary/any (last visited Aug. 7, 2017).

would it likely be?> <is there any evidence of the crime?>. (2) In the negative assertions, it creates an emphatic negative, meaning "not at all" or "not even one" <it was not in any way improper> <she did not know any member who was at the event>. (3) In affirmative sentences, it means "every" or "all" <any attempt to flout the law will be punished> <you are required to produce any documents related to the issue>. (4) In a sentence implying that a selection or discretionary act will follow, it may mean "one or more (unspecified things or people); whichever; whatever" <any student may seek a tutorial> <pick any books you like> <a good buy at any price>. (5) In a declarative sentence or imperative involving a qualitative judgment, it means "of whatever kind" <you'll have to take any action you consider appropriate>. In this sense, there is sometimes the implication that the quality may be poor <any argument is better than no argument>. (6) In a declarative sentence involving a quantitative judgment, it means "unlimited in amount or extent; to whatever extent necessary" <this computer can process any quantity of numbers simultaneously>. In a related colloquial sense, it may mean "of great size or considerable extent" when following a negative <we won't be able to make any real headway this week>.

Bryan A. Garner, Garner's Modern English Usage 51 (4th ed. 2016).

"Any," at first blush a simple word, has variable meanings depending upon the context in which the term is used. The problem we face here is that, not only is the term itself amenable to multiple definitions and usages, but the context in which it appears also is unhelpful. The remainder of Rule 542 offers us no guidance as to whether the term "any" was intended to mean "any" in its singular or less than total sense, or whether it was intended to mean one, some, or all. Each construction would be reasonable in this case. Because "[a] statute is ambiguous when there are at least two reasonable interpretations of the text," *A.S. v. Pa. State Police*, 143 A.3d 896, 905–06 (Pa. 2016), Rule 542(E) is ambiguous.

When language is ambiguous, this Court generally may resolve the ambiguity by considering: "the occasion and necessity for the statute or regulation; the circumstances under which it was enacted; the mischief to be remedied; the object to be attained; the former law, if any, including other statutes or regulations upon the same or similar subjects; the consequences of a particular interpretation; and administrative interpretations of such statute." *Freedom Med. Supply, Inc. v. State Farm Fire & Cas. Co.*, 635 Pa. 86, 131 A.3d 977, 984 (2016) (citing 1 Pa.C.S. § 1921(c)). However, there are additional canons of statutory interpretation that we must consider as well. Relevant here is our "canon of constitutional avoidance."[4] We invoked this canon of restraint recently in *Commonwealth v. Veon*, 150 A.3d 435 (Pa. 2016):

[W]e are bound to interpret a statute, where possible, in a way that comports with the constitution's terms. 1 Pa.C.S. § 1922 (directing us to presume "[t]hat the General Assembly does not intend to

---

4. As detailed below, the lower courts' interpretations of "any" raise considerable due process concerns that necessitate avoidance of an expansive interpretation. Moreover, because the term is ambiguous, the rule of lenity also would apply and would require a more restrictive interpretation of "any." *See Commonwealth v. Fithian*, 599 Pa. 180, 961 A.2d 66, 74 (2008) (explaining that, if an ambiguity exists in a penal statute, the ambiguity should be resolved in the light most favorable to the accused).

violate the Constitution of the United States or of this Commonwealth"). We reach a constitutional challenge only when we find no tenable interpretation of the statute in question that obviates the necessity of doing so. "When the validity of [a statute] is drawn in question, and if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided." *Commonwealth v. Monumental Props., Inc.*, 459 Pa. 450, 329 A.2d 812, 827 (1974) (quoting *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932)). In *MCI WorldCom, Inc. v. Pa. Pub. Utility Comm'n*, 577 Pa. 294, 844 A.2d 1239 (2004), we explained the governing principle as follows:

> The "canon of constitutional avoidance" provides that when a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter. *See Harris v. United States*, 536 U.S. 545, 555, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002).... Pennsylvania explicitly recognizes this canon by statute in instances where construction of a Pennsylvania statute is at issue. *See* 1 Pa.C.S. § 1922; *see also Commonwealth v. Bavusa*, 574 Pa. 620, 832 A.2d 1042, 1050–51 (2003).

*MCI WorldCom*, 844 A.2d at 1249–50.

*Veon*, 150 A.3d at 443 (citations modified).

Although "any" is susceptible to myriad interpretations, for purposes of the narrow question at issue in this case, only two are relevant. The one formulated by the Superior Court reads "any" to include "every" element of the crimes charged. The other interpretation encompasses something less than every element, whether one element or some, but not all, elements. As we shall see, the former interpretation raises grave due process concerns that render it unsustainable, requiring it to give way to a construction that does not raise the same concerns.

## IV.

### A.

Before addressing these due process concerns, a brief jurisprudential note is in order. The issue upon which this Court granted review is the validity of a *prima facie* case established only by hearsay in light of a criminal defendant's constitutional right to confront and cross-examine witnesses against him or her, a right which traditionally has been confined to the trial setting. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 52–53, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). Indeed, the confrontation right has been the focus of this case from its inception. Nonetheless, in their briefing to this Court, both the Commonwealth and Ricker have determined that due process considerations are integral to a full resolution of the claim, and both parties have asserted expressly to us here that the due process issue is unavoidable.[5] It is rare that opposing parties agree on a fundamental point in a case. Undoubtedly, the parties are more familiar than we are with this case, having been involved with it from its outset. They have determined that

---

5. *See* Brief for Ricker at 14, 33–34; Brief for the Commonwealth at 17 n.3 ("The Superior Court found the due process claim unpreserved. As noted by [Ricker], both parties seek review of this claim as well. The [Common-wealth] waives any right to assert that this claim has not been preserved. Resolution of both the Confrontation Clause and due process claim is in the public interest.").

consideration of due process issues is necessary for compete disposition of this matter. The Commonwealth has gone so far as to. waive expressly any challenge to issue preservation. I would grant the. parties' joint request for review.

Occasionally, in order to resolve a complicated legal question upon which *allocatur* was granted, we must consider issues beyond those that have been the focus of the lower courts.[6] This is particularly true for a discretionary court such as ours. Sometimes, the parties recognize that our review and resolution of a discrete legal claim would be hampered without consideration of a separate issue. And so it is with today's case. Hence, though uncommon, at times our function necessitates incorporating and addressing additional claims or arguments, such as the due process issue agreed upon by the parties here.

Furthermore, both statutory interpretation and constitutional determinations are questions of law, which allow for *de novo* review. *See Commonwealth v. Lutz–Morrison*, 143 A.3d 891, 894 (Pa. 2016) (statutory interpretation); *Commonwealth v. Smith*, 635 Pa. 38, 131 A.3d 467, 472 (2015) (constitutional due process). Both parties have

agreed that the due process issue is indispensable to the ultimate disposition of this case, and both have availed themselves of the opportunity to brief that issue in full. Accordingly, there are no jurisprudential reasons to abstain from the due process considerations that are implicated in this case.

## . B.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prevents states from depriving "any person of life, liberty, or property, without due process of law .…." U.S. CONST. amend. XIV, § 1.[7] In addition to incorporating specific provisions of the Bill of Rights to the states and providing certain substantive rights, the clause generally serves to protect individuals from processes and procedures so unfair that they offend "fundamental conceptions of justice," *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)), and to uphold traditional notions of fundamental fairness and ordered liberty. *Id.*[8]

---

**6.** At times, this Court identifies such issues, . . and directs the parties to include them in their presentations to this Court. By way of example, consider our recent grant of *allocatur* in *Commonwealth v. Livingstone*, 635 Pa. 269, 135 A.3d 1016 (2016) *(per curiam)*, where, in order to consider a police seizure of a vehicle for purposes of rendering aid, we directed the parties to brief and to argue the potential application of the community caretaker doctrine, even though the issue had not been part of the lower courts' analysis and even though neither party requested consideration of that issue.

.**7.** The Due Process Clause generally encompasses two species of protection. The first category, known as substantive due process, applies to those rights "created only by the Constitution," *see Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 229, 106 S.Ct.

507, 88 L.Ed.2d 523 (1985), and "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (citations and internal quotation marks omitted). The second category is procedural due process, which embodies the notion that "[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (quoting *Baldwin v. Hale*, 1 Wall. 223, 233, 68 U.S. 223, 17 L.Ed. 531 (1863)). In today's case, only procedural due process is at issue.

**8.** As noted *infra*, though broad on its face, procedural due process is not a device for imposing substantive or normative notions of

In his oft-quoted concurrence in *Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), Justice Felix Frankfurter remarked upon the role that due process plays in safeguarding fairness for those involved in the judicial system, noting that "[f]airness of procedure is due process in the primary sense. It is ingrained in our national traditions and is designed to maintain them." *Id.* at 161, 71 S.Ct. 624 (Frankfurter, J., concurring) (internal citation and quotation marks omitted). Justice Frankfurter then offered the following historical quote from *Hagar v. Reclamation Dist., No. 108*, 111 U.S. 701, 708, 4 S.Ct. 663, 28 L.Ed. 569 (1884): "(B)y 'due process' is meant one which, following the forms of law, is appropriate to the case, and just to the parties to be affected. It must be pursued in the ordinary mode prescribed by the law; it must be adapted to the end to be attained; and wherever it is necessary for the protection of the parties, it must give them an opportunity to be heard respecting the justice of the judgment sought." *Joint Anti–Fascist Refugee Comm.*, 341 U.S. at 162, 71 S.Ct. 624 (Frankfurter, J., concurring). Finally, Justice Frankfurter offered the following insight upon the place of due process in a system of ordered justice:

> The requirement of 'due process' is not a fair-weather or timid assurance. It must be respected in periods of calm and in times of trouble; it protects aliens as well as citizens. But 'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Expressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through centuries of Anglo–American constitutional history and civilization, 'due process' cannot be imprisoned within the treacherous limits of any formula. Representing a profound attitude of fairness between man and man, and more particularly between the individual and government, 'due process' is compounded of history, reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess. Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process.
>
> \* \* \*
>
> Due process is perhaps the most majestic concept in our whole constitutional system. While it contains the garnered wisdom of the past in assuring fundamental justice, it is also a living principle not confined to past instances.

*Id.* at 162–63, 174, 71 S.Ct. 624.[9]

Notwithstanding the constitutional dimensions of "fundamental fairness," its scope has not been unbounded, and the principle is not simply a catch-all repository allowing resort to sundry invocations of fairness when no lawful remedy exists. In *Lovasco*, the Supreme Court emphasized the limitation as follows:

> American freedom is, in no small measure, the history of procedure."); and *McNabb v. United States*, 318 U.S. 332, 347, 63 S.Ct. 608, 87 L.Ed. 819 (1943) (Frankfurter, J., concurring) ("The history of liberty has largely been the history of observance of procedural safeguards.").

just results. *See e.g. Dowling* 493 U.S. at 352, 110 S.Ct. 668 ("Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.").

9. *See also Malinski v. New York*, 324 U.S. 401, 414, 65 S.Ct. 781, 89 L.Ed. 1029 (1945) (Frankfurter, J., concurring) ("The history of

Judges are not free, in defining "due process," to impose on law enforcement officials [their] "personal and private notions" of fairness and to "disregard the limits that bind judges in their judicial function." *Rochin v. California*, 342 U.S. 165, 170, 72 S.Ct. 205, 96 L.Ed. 183 (1952).... [They] are to determine only whether the action complained of ... violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935), and which define "the community's sense of fair play and decency," *Rochin*, 342 U.S. at 173, 72 S.Ct. 205.

*Lovasco*, 431 U.S. at 790, 97 S.Ct. 2044 (citations modified).

Still, while bounded by principles of restraint, procedural due process nonetheless provides important protections to criminal defendants, largely to ensure the fairness of proceedings. In the pretrial stage, procedural due process provides a litany of protections, as summarized by Professor Wayne LaFave and his colleagues in their treatise on criminal procedure:

> At the investigatory stage, due process restricts the state's utilization of lineups, showups, and other identification procedures insofar as they present a "substantial likelihood of irreparable misidentification," prohibits police practices that are so "outrageous" as to "shock the conscience," and mandates against the intentional destruction or failure to preserve evidence recognized to be exculpatory and actions directed at making it more difficult for the defendant to locate potentially favorable witnesses. At the charging stage, due process prohibits unjustified extensive delay in charging that results in prejudice to the defense in preparing its case and charges that are the product of prosecutorial vindictiveness. At the pretrial stage, due process governs procedural elements of the motion to suppress, ensures that the defense receives reciprocal discovery when it is required to provide discovery to the prosecution, provides the indigent defendant with access to experts as needed to evaluate and present a contention resting on scientific expertise (*e.g.*, insanity), recognizes a defense right to obtain during pretrial discovery governmental records determined by the trial court to contain material exculpatory information, imposes on the prosecution a duty to disclose to the defense or court material exculpatory evidence that is within its possession or control, and prohibits state timing requirements for motions that are so stringent as to deny the defendant a reasonable opportunity to raise a constitutional objection.

1 WAYNE R. LAFAVE ET AL., Criminal Procedure § 2.7(a) (4th ed. 2015) (footnotes and citations omitted).

It is indisputable that neither the United States Constitution nor the Pennsylvania Constitution requires a preliminary hearing. This does not mean that, once afforded, the hearing lies outside the scope of due process protections. To date, neither the United States Supreme Court nor this Court has defined the protections demanded by due process when the Commonwealth proceeds with a preliminary hearing, at least not with regard to the quantity of admissible evidence that the Commonwealth must advance in order to support a magisterial district judge's decision to bind a defendant over for trial. We approached the question in *Commonwealth ex rel. Buchanan v. Verbonitz*, 525 Pa. 413, 581 A.2d 172 (1990) (plurality). In that case, five Justices held that the due process implications attendant to any adju-

dicative proceeding attach as well to preliminary hearings.

On its face, *Verbonitz* is a plurality decision. Closer inspection reveals that a majority of the Court would have held that constitutional principles of due process apply, at least to some degree, at preliminary hearings. Justice Larsen authored the lead opinion, which was joined by Justices Zappala and Papadakos. Justice Larsen noted that, to satisfy its *prima facie* burden, "the Commonwealth must produce legally competent evidence ...." *Id.* at 174. He then continued:

> In this case it is clear that the Commonwealth did not meet its burden. As Justice Flaherty stated in his concurring opinion in *Unemployment Compensation Board of Review v. Ceja*, 493 Pa. 588, 427 A.2d 631, 647 (1981) (Flaherty, J., concurring), **"fundamental due process** requires that no adjudication be based solely on hearsay evidence". If more than "rank hearsay," *id.,* is required in an administrative context, the standard must be higher in a criminal proceeding where a person may be deprived of his liberty.

*Id.* (citation modified; emphasis added).

Similarly, Justice Flaherty, joined by Justice Cappy, acknowledged that there is no constitutional right to a preliminary hearing. However, he noted that, when, by law, a state creates a hearing, certain rights, such as the right to counsel and possibly the right to confront witnesses, necessarily attach. Justice Flaherty then addressed directly the question of whether hearsay "standing alone" may constitute sufficient evidence for a *prima facie* case; unequivocally, he would have held that such evidence was insufficient. *Id.* at 175 (Flaherty, J., concurring) (emphasis omitted). Justice Flaherty deemed "this to be a requirement of due process," *id.*, and reiterated his pronouncement in *Ceja* that

"[f]undamental due process requires that no adjudication be based solely on hearsay evidence." *Id.* at 176 (quoting *Ceja*, 427 A.2d at 647 (Flaherty, J., concurring)).

In the case *sub judice*, the Superior Court effectively buried *Verbonitz* as a valueless plurality. This was a parched interpretation. In *Verbonitz*, five Justices of this Court agreed that, to some degree, constitutional due process attaches at a preliminary hearing and prohibits cases from being bound over for trial based solely upon hearsay. Far from lacking persuasive value, the *Verbonitz* opinions should together be recognized as a holding that due process prohibits the Commonwealth from depriving a person of liberty upon nothing more than inadmissible hearsay. A hearing premised only on hearsay cannot comport with any reasonable understanding of "fundamental conceptions of justice" or "the community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790, 97 S.Ct. 2044.

### C.

For a *prima facie* case to rest upon nothing more than inadmissible hearsay is to offend traditional notions of procedural due process. At such an illusory proceeding, the interests, purposes, rights, and benefits of a preliminary hearing are denuded of substance or meaning.

Although not constitutionally mandated, a preliminary hearing, once established, plays a vital role in our criminal justice system. For all parties involved, it serves a core function, and it protects against unwarranted governmental intrusions upon a citizen's liberty. "The primary reason for the preliminary hearing is to protect an individual's right against unlawful arrest and detention." *Commonwealth ex rel. Maisenhelder v. Rundle*, 414 Pa. 11, 198 A.2d 565, 567 (1964). Additionally, the

hearing "seeks to prevent a person from being imprisoned or required to enter bail for a crime which was never committed, or for a crime with which there is no evidence of his connection." *Id.*

In *Coleman v. Alabama*, the United States Supreme Court described the role of counsel at the preliminary hearing. In determining that such a proceeding, when afforded by state law, is a critical stage of the criminal justice system at which the right to counsel attaches, the Court explained that the preliminary hearing may serve to prevent "erroneous or improper prosecution." *Coleman*, 399 U.S. at 9, 90 S.Ct. 1999. The Court described defense counsel's functions at the hearing as follows:

First, the lawyer's skilled examination and cross-examination of witnesses may expose fatal weaknesses in the State's case that may lead the magistrate to refuse to bind the accused over. Second, in any event, the skilled interrogation of witnesses by an experienced lawyer can fashion a vital impeachment tool for use in cross-examination of the State's witnesses at the trial, or preserve testimony favorable to the accused of a witness who does not appear at the trial. Third, trained counsel can more effectively discover the case the state has against his client and make possible the preparation of a proper defense to meet that case at the trial. Fourth, counsel can also be influential at the preliminary hearing in making effective arguments for the accused on such matters as the necessity for an early psychiatric examination or bail.

*Id.*

Although the panoply of constitutionally provided trial rights does not apply in its entirety at a preliminary hearing, the hearing clearly is intended to be more than a mere formality. The very rule that we are called upon to interpret provides a right to counsel and to cross-examine witnesses. The rule further provides the accused with the right to inspect the evidence offered by the Commonwealth.

The preliminary hearing was not created for the purpose of serving as a trial preparation tool for the defense. *See Commonwealth v. Sanchez*, 623 Pa. 253, 82 A.3d 943, 984 (2013). This does not mean that no benefits necessarily and naturally accrue to the defendant in conducting the hearing according to its true purpose and within the confines of our Constitutions. A true preliminary hearing involves introduction by the Commonwealth of the minimum competent evidence to establish a *prima facie* case. In doing so, the Commonwealth opens its case to preliminary inspection and subjects its witnesses to basic cross-examination. Each is necessary to convince the presiding judicial officer that the Commonwealth's restraint upon the accused's liberty is warranted. As noted in *Coleman*, this allows the accused and his counsel to probe the testimony, to make arguments against the charges or in favor of bail, and to preserve favorable testimony. It also serves as a limited discovery tool, which can inform decisions on whether to challenge the seizure of the accused or the acquisition of evidence in a suppression motion, and on what defense to pursue, if any. Moreover, the ability to participate fully in a preliminary hearing can aid in focusing subsequent expenditures of limited investigative resources, something that is particularly beneficial to chronically (and unlawfully) underfunded public defender's offices. *See Kuren v. Luzerne Cty.*, 146 A.3d 715, 717 (Pa. 2016).

Inevitably, the protocol that would ensue if due process tolerated *prima facie* cases premised upon hearsay alone would typically allow a prosecutor merely to call a police officer to the witness stand to read

reports and summaries of interviews to the magisterial district judge. The officer would not even be required to have any involvement in the case. In busy cities like Philadelphia and Pittsburgh, the Commonwealth could install one police officer in each criminal courtroom and simply have that officer read the reports as the cases are called, with no requirement of prior familiarity with any case. Under such a protocol, the right to counsel and the rule-based right to cross-examine witnesses would amount to nothing more than hollow formalities, promises broken. Counsel's functions, as outlined by the Supreme Court in *Coleman*, would cease to exist. There would be no ability to test the Commonwealth's *prima facie* case, no witnesses to cross-examine, no testimony to preserve. Counsel would not be able to identify weaknesses in the Commonwealth's case or to identify possible defenses, as counsel would have no reason to be confident that the statements read by police officers accurately or fully reflect what the witness would say on the witness stand at trial. The right to counsel, and counsel's concomitant rule-based right to cross-examine witnesses, would shrink to a right merely to have a warm body stand next to the accused, incapable of serving any real function on the accused's behalf.

Additionally, the accused would be deprived of the other benefits that flow from participating in a preliminary hearing, such as obtaining a fair idea of the case against him or her and being able to allocate resources accordingly. At the same time, the Commonwealth would benefit from shielding its case and its witnesses from testing and examination, and would be permitted to proceed on little more than its assurance that it will produce competent evidence at some later date.

Perhaps as importantly, the presiding magistrate would be unable to perform his or her function. That judicial officer must evaluate the Commonwealth's case and be convinced that the Commonwealth's charges are justified and that the Commonwealth's evidence warrants subjecting the accused to a full trial. If a magisterial district judge renders a decision based exclusively upon evidence that cannot be used against the accused at a later trial, no confidence can be ascribed to that decision. In principle, the justification for the Commonwealth's charges would be no different than if the prosecutor had looked up to the judicial officer and said "trust me, we can prove this case later." No restraint upon a person's liberty can rest upon such a premise.

As a flexible concept, due process is necessarily incapable of precise definition. However, by any definition, principles of fundamental fairness and ordered liberty demand minimally that, when the law affords an individual a hearing, particularly one where restraint of a person's liberty interest is at issue, that hearing cannot be a functionless formality, nor entirely one-sided. Our Constitutions and our laws identify rights and interests that play an important role in the preliminary hearing. When the Commonwealth is permitted to circumvent each of those rights and interests by introducing only evidence that cannot be introduced at trial, and nothing more, that hearing falls well below the line that due process draws. Nothing about such a hearing satisfies "the community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790, 97 S.Ct. 2044.

When the law affords a hearing to a person involved in our judicial system, particularly a hearing in which that person's liberty is at stake, the hearing must be more than a mere formality. In the words of Justice Benjamin Cardozo, "[t]he hearing, moreover, must be a real one, not a sham or a pretense." *Palko v. State of*

*Connecticut,* 302 U.S. 319, 327, 58 S.Ct. 149, 82 L.Ed. 288 (1937) (citations omitted) (*overruled by Benton v. Maryland,* 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (holding that the Due Process Clause required incorporation of the Fifth Amendment's Double Jeopardy Clause to the states)).

## V.

Because a *prima facie* case that rests exclusively upon hearsay would violate constitutional due process requirements, any interpretation of Rule 542(E) that permits such a result also is unconstitutional. As such, the Superior Court's interpretation must be avoided. *See Veon,* 150 A.3d at 443. The ambiguity that surrounds Rule 542(E)'s use of the term "any" must be resolved in favor of Ricker. The term cannot mean "all."

The issue in this case only requires consideration of whether "any" can mean "all." Beyond that, the question of what portion of a *prima facie* case can rest upon hearsay is not before the Court. The Criminal Procedural Rules Committee, comprised of judges, prosecutors, and defense lawyers, should consider that question in the first instance and in light of today's result. Those additional considerations are not before the Court, and should be reviewed in short order by the Committee.

For purposes of the present case, Ricker did not receive a preliminary hearing in accordance with the manner required by due process. The Superior Court's decision to the contrary must be reversed, and Ricker must be afforded a new preliminary hearing.

